UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| RUTH ANN BRAZIER, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>OXFORD COUNTY, LLOYD HERRICK, )<br>and JANE DOE, )<br>)<br>Defendants ) | Civ. No. 07-CV-54-B-W |

**RECOMMENDED DECISION**

This civil action arises from alleged strip searches of the plaintiff, Ruth Ann Brazier, at the Oxford County Jail. It also concerns an issue pertaining to the provision of bail in connection with a misdemeanor arrest. Now pending are the defendants' motion for summary judgment on all six counts of the plaintiff's complaint and the plaintiff's much belated motion to substitute Arlene Kerr for the Jane Doe defendant named in her complaint. I recommend that the defendants' motion be granted in part and that the plaintiff's motion to substitute be denied. The defendants' Local Rule 56 motion to strike is granted in part and denied in part.

**A. The Plaintiff's Motion to Substitute**

Ms. Brazier filed this civil rights action against the County, its sheriff, Lloyd Herrick, and an unnamed jail officer who conducted the searches, identified in the pleadings as Jane Doe. On August 22, 2007, after service of process on both the County and Sheriff Herrick, and after the filing of their answers, the Court issued its scheduling order, which set November 7, 2007, as the deadline for amendment of the pleadings and joinder of parties, and January 23, 2008, as the

deadline for completion of discovery. (Sched. Order, docket item 7.) In answers to interrogatories signed under oath on October 17, 2007, Ms. Brazier averred that the officer who conducted her strip searches was Arlene Kerr. (Pl.'s Ans. to Defs.' Interrogs. ¶¶ 3f, 19, docket item 28.) Despite knowing the identity of the Jane Doe defendant in advance of the deadline for amendment, Brazier failed to amend her pleadings in conformity with the scheduling order. The defendants timely moved for summary judgment and for judgment on the pleadings. Among the legal challenges advanced by the defendants is the argument that Jane Doe is entitled to *judgment in her favor* because the complaint was not timely amended to identify the actual defendant. (Defs.' Mot. for Summ. J. and J. on the Pleadings at 17-18, docket item 9.)

Brazier filed the pending motion to substitute in tandem with her opposition to the dispositive motions on March 5, 2008. (Mot. to Substitute, docket item 18.) In support of her much belated motion to substitute, Brazier filed an affidavit in which she states under oath that she "only recalled the name of the corrections officer while having [her] deposition taken . . . on December 5th and 6th, 2007." (Brazier Aff. ¶ 6, docket item 19.) This sworn statement is, of course, flatly contradicted by her prior sworn answers to the defendants' interrogatories.

This is a vexing motion. It is not only four months late, but is supported by a demonstrably false explanation. In effect, Brazier's counsel neglected to amend the complaint to name Kerr as a defendant and then attempted to cover his tracks with an affidavit from his client containing a known falsehood. That false explanation, it should be noted, is not even a particularly good one. If Brazier remembered Kerr's name at the beginning of December, why did she wait another three months to substitute Kerr, after the dispositive motions deadline, when Kerr has not yet even been served?

Rule 15 states that the Court should grant a motion to amend made prior to trial when justice so requires. Fed. R. Civ. P. 15(a)(2). Although it is true, as defendants argue, that Rule 16 requires a showing of good cause for the Court to modify a scheduling order, Fed. R. Civ. P. 16(b)(4), the practical consequence of denying the motion to substitute might be that Brazier can simply file another civil action that does name Kerr as a defendant.[1] This would not necessarily be beneficial to the current defendants, but the alternative is to stop this case in its tracks and go back to the beginning in order to allow Kerr to be served, initiate her own discovery, and perhaps, most significantly given the current posture of the case, assert her own defenses to the complaint. Whether other provisions of the Federal Rules or legal doctrines might bar a separate lawsuit against Kerr is not an issue decided by this motion.

As it stands, my recommendation is to deny Brazier's motion to substitute Arlene Kerr as a party defendant, and enter judgment for Jane Doe on the current complaint, as defendants have requested. Alternatively, if counsel for the existing defendants is willing to accept service on Kerr's behalf and forego any discovery in this case, I would recommend allowing the substitution and naming Kerr as a party and entering judgment for her. I would treat Brazier's non-compliance with the scheduling order and her demonstrably false statement to the Court as conduct that should be sanctioned under Rule 16(f). That provision authorizes the Court to sanction the failure to obey a scheduling order with the remedies afforded under Rule 37(b)(2)(A(ii)-(vii). See Fed. R.Civ.P. 16(f)(1)(C). Among the available sanctions is the following: "prohibiting the disobedient party from supporting or opposing designated claims or defenses." Fed.R.Civ.P. 37(b)(2)(A)(ii). I would prohibit Brazier from presenting any evidence

---

[1] The statute of limitation on the § 1983 claim is six years in Maine. Douglas v. York County, 433 F.3d 143, 144 (1st Cir. Me. 2005).

3

in support of her claim against Kerr individually (although not evidence about Kerr's conduct, as it relates to the other defendants) and enter judgment on Kerr's behalf as a named defendant.

I offer a recommendation on the motion to substitute, rather than simply ruling on the motion, because either alternative would result in a dispositive order on counts V and VI.

**B.    The Defendants' Motion for Summary Judgment and Judgment of the Pleadings**

Brazier's complaint recites that her Fourth Amendment rights were violated when she was subjected to strip searches at the Oxford County Jail. She seeks to impose municipal liability against the County (count I) and supervisory liability against Sheriff Lloyd Herrick (counts II and III) for strip searches allegedly carried out by corrections officer Arlene Kerr. She also seeks to impose municipal liability against the County for the alleged "denial of bail" by unspecified county personnel (count IV). The defendants argue that they are entitled to judgment on the pleadings because the Constitution does not protect against strip searches performed in connection with any lawful incarceration. (Defs.' Mot. at 5-11.) They also argue that the County and Sheriff Herrick cannot be liable in this case because the alleged strip searches did not arise from an official county policy or custom or from an unofficial pattern or practice tolerated or condoned by jail administrators. (Id. at 11-15.) As for the matter of bail, the County argues that it cannot be liable because its administration of bail was not capricious and there is no evidence that Brazier's overnight detention stemmed from a policy or custom. (Id. at 16-17.) Finally, the defendants argue that "Jane Doe" is entitled to judgment because Arlene Kerr was not timely named or served in this action, which is an issue I have already addressed in the context of the motion to substitute. (Id. at 17-18.)

### 1. Motion for judgment on the pleadings

The request for judgment on the pleadings is based on a legal argument that is clearly foreclosed by applicable law in this Circuit. The First Circuit's opinion in Miller v. Kennebec County, 219 F.3d 8 (1st Cir. 2000), and other opinions clearly hold that it is unconstitutional to perform a strip search on a misdemeanor arrestee in the absence of suspicion that the person being detained is secreting contraband or weapons on his or her person. Id. at 12 (agreeing with the District Court that repeated strip searches of plaintiff were "not justified by a reasonable suspicion that she was concealing contraband or weapons, particularly because the offense for which she was detained—failure to pay a fine—gave rise to no such suspicion"); see also Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 62 (1st Cir. 2003). Accordingly, the Court should deny the defendants' motion for judgment on the pleadings (docket item 10).

### 2. Motion for summary judgment

The following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Some factual content is also drawn from record sources brought to my attention in the course of my review of the materials cited in connection with the pending motions. See Ricci v. Applebee's Northeast, Inc., 297 F. Supp. 2d 311, 320-21 (D. Me. 2003) (overlooking an evidentiary gap in the parties' statements of material facts where material testimony in an exhibit introduced by the movant happened to come to the Court's attention and filled the gap).

Lloyd Herrick was the Sheriff of Oxford County from January 1, 1991, until December 31, 2006. (Defs.' Statement ¶ 1, docket item 11.) As Sheriff of Oxford County, Lloyd Herrick was the final decision maker at the Oxford County Jail. (Id. ¶ 2.) Captain Ernest Martin has held the title of Jail Administrator at the Oxford County Jail since 1987. Between 1978 and 1987, Captain Martin held the title of Chief Corrections Officer at the Oxford County Jail, but his job duties and responsibilities were essentially the same as in his current position. (Id. ¶ 3.) Captain Martin is responsible for the day-to-day operation of the jail. (Id. ¶4.)

Oxford County Jail Policy and Procedure D-220 is the official policy and procedure of the Oxford County Jail regarding searches and was in effect on the date of the incidents in this lawsuit. (Id. ¶5.) As concerns strip searches of arrestees charged with misdemeanor offenses, policy D-220 provides:

> INMATES CHARGED WITH MISDEMEANOR CRIMES:
> a. **the inmate *will not* be strip searched** unless there is reasonable suspicion to believe that the inmate is hoarding evidence to a crime, weapons, drugs or contraband.

(Id. ¶ 6, emphasis in original.) A copy of the Oxford County Jail Policy and Procedure Manual is located in the staff office room for corrections officers to review and consult. There is also a copy of the Manual for administrative staff. (Id. ¶ 9.) Captain Martin keeps the manuals updated by replacing pages when necessary. (Id. ¶ 10.) When a policy is revised, Captain Martin sends an e-mail memorandum to all corrections officers informing them that a policy has been revised. (Id. ¶ 11.) A copy of the Maine Attorney General's ruling concerning strip searches has been posted on the wall of the booking area since 1985 and has been updated whenever a new ruling has come out. (Id. ¶ 12.)

All jail staff are trained at the beginning of their employment in the policy and procedures regarding searches and are given periodic updates and retraining during the tenure of their employment. (Id. ¶ 13.) No instructions or directives are given to jail staff regarding strip searches that are in any way inconsistent with the contents of Policy D-220. (Id. ¶ 14.)

Lloyd Herrick did not have any knowledge of or involvement in the strip searches allegedly conducted on April 25, 2006, and May 9, 2006. (Id. ¶ 15.) He first learned of the strip searches in the spring of 2007. (Id. ¶ 16.) Other than this particular case, there have been no prior suits involving allegations that any employee of the Oxford County Jail unlawfully strip searched an arrestee, pretrial detainee or inmate. (Id. ¶ 17.) According to Herrick, neither have there been any complaints of unlawful strip searches since 1992, other than the instant case. (Id. ¶¶ 18, 19.) Brazier believes that there may have been one or more incidents in the 2002 timeframe because Captain Martin circulated a reminder memorandum to the correctional officers in December 2002 reminding them "that discretion needs to be exercised whenever a decision is made to strip search a misdemeanor arrest." (Pl.'s Response to Defs.' Statement ¶ 18; Dec. 18, 2002, Memorandum, Pl.'s Ex. 6, docket item 15-7.)[2]

---

[2] The defendants inserted on the docket a motion to strike Brazier's opposing statement concerning the memorandum because it "does not establish that illegal strip searches were occurring." (Defs.' Request to Strike at 1, Doc. No. 25.) The request is sustained, in part, in that I do not treat the response as a denial but as a qualification. The existence of the memorandum is relevant, but it does not independently prove that unlawful strip searches prompted Captain Martin to circulate it.

Although I conclude that the request to strike the opposing statements should be sustained, it is not appropriate for the Court to grant the request in the form of an order on a motion to strike. Local Rule 56(e) clearly reflects that a request to strike a statement contained in the non-movant's opposing statement of material facts should be made in a reply statement and *not* in a formal motion to strike. In fact, the Rule flatly states that motions to strike statements of fact are not allowed. The error here is simply that counsel for the defendants should not have identified docket item 25 as a motion to strike when counsel entered the filing on the electronic filing system. Doing so resulted in the motion being flagged as a formal motion and it caused the system to apply a full 21-day response time by default, which postponed resolution of the pending dispositive motions. The proper approach would have been to identify the filing as a reply statement of material facts. In any event, although Local Rule 56 allowed the plaintiff in this instance 11 days to respond to this sort of request, no response was ever filed.

On April 25, 2006, Brazier was arrested for operating a vehicle without a license and failing to obtain a Maine driver's license.[3] (Defs.' Statement ¶ 20.) Brazier was transported to the Oxford County Jail and she arrived at the jail at approximately 9:01 p.m. on April 25, 2006. (Id. ¶ 21.) Brazier's deposition testimony reflects that she understood on the evening of April 25, 2006, that she would be detained until she could secure $40 to pay the bail commissioner's fee.[4] (Id. ¶¶ 23, 24, 25, 26.) Brazier attempted to call a family member, but the family member's phone was off. (Id. ¶ 26.) The next morning someone arrived to pay the fee and Brazier was released by approximately 10:40 a.m. after being bailed by a bail commissioner. (Id. ¶¶ 28, 29, 30, 31.) According to Brazier, she was strip searched in connection with her overnight incarceration. (Id. ¶ 22.)

On May 9, 2006, Brazier was arrested again for failing to obtain a Maine driver's license and violating conditions of release. (Id. ¶ 32.) Brazier was transported to the Oxford County Jail and arrived at approximately 9:05 a.m. on May 9, 2006. (Id. ¶ 33.) Brazier asserts that she was strip searched during the intake procedure for the May 9, 2006 arrest. (Id. ¶ 34.) At approximately 12:28 p.m. on May 9, 2006, Brazier was transported to court. (Id. ¶ 35.) In court, the judge released Brazier on personal recognizance. (Id. ¶ 36.) Thereafter, Brazier was returned to the Oxford County Jail to be processed and released. (Id. ¶ 37.) According to Brazier, she was strip searched upon her return from court prior to her release. (Id. ¶ 38.)

---

[3]   The deposition testimony cited by the defendants reflects that the charge was for Brazier's failure to have a license in her possession and for failure to obtain a Maine license despite being a Maine resident for more than 30 days. (Brazier Dep. 76-77.)

[4]   The colloquy between Brazier and defense counsel reflects that she first testified that she was not told that bail was set. Immediately thereafter, however, she responded to follow-up questions and testified that she made a phone call that evening for purposes of getting bail. She also testified that it "sounds true" that bail was set for her that evening. (Brazier Dep. 54-56.)

Brazier was released from the Oxford County Jail at approximately 2:29 p.m. on May 9, 2006. (Id. ¶ 39.)[5]

According to Brazier's answers to interrogatories, Arlene Kerr was the corrections officer who strip searched her and Officer Kerr stated to Brazier that "[w]e search all inmates in here for the guard's protection" and that "[w]e always do a search when anyone leaves the jail and return[s]."  (Pl.'s Ans. to Def.'s Interrogs. ¶¶ 3(f), 6(c).)

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light

---

[5] In light of the motion to substitute, it seems strange that Brazier should merely admit these passive voice statements by the defendants.  It is plain that the defendants are wording their statement of material facts to avoid naming the corrections officer who conducted the alleged strip searches.  Nevertheless, Brazier simply admits each of the statements, without offering a qualification that would supply the officer's name. For example, both of the following statements are admitted without a qualification to identify the officer who conducted the alleged search:

> 40. Plaintiff alleges that the strip search conducted on April 25, 2006, and the two strip searches conducted on May 9, 2006, were all conducted by the same corrections officer. *Brazier dep*., pp. 103, 176.

> 41. Plaintiff alleges that she knew the name of the corrections officer who conducted the strip searches by the time she left the jail in connection with the April 25, 2006 arrest. *Brazier dep*., pp. 105-06.

Of course, a review of the cited pages supplies the name of the officer, but it is astounding to think that Brazier's counsel does not observe the omission given the Jane Doe issue that arises from his failure to amend the complaint and that he does not take it upon himself to supply the name in his responsive statement of material facts in order to satisfy his client's burden of proof.

most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merch. Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). Brazier's civil action is based in part on strip searches and in part on a bail-related issue. I address the bail issue first before addressing the strip searches.

### *a. The denial of bail claim*

Brazier argues that her overnight detention on a misdemeanor traffic violation was a deprivation of a right or privilege secured by the United States Constitution or a federal law. She cites 29-A M.R.S.A. §§ 103 and 1251(1), which together demonstrate that operating a motor vehicle without the appropriate license is sometimes a criminal offense and sometimes a mere traffic infraction, depending on the circumstances. In the factual recitation[6] contained in her opposition memorandum Brazier states that she was arrested on the evening of April 25, 2006, for violating 29-A M.R.S.A. § 1251(1)(A) and (1)(D) (Supp. 2007), which are both classified as Class E crimes. (Pl.'s Opposition at 1, Doc. No. 15.) In her complaint Brazier complains that she was denied her right to bail. (Compl. ¶ 96.) In her memorandum, however, she appears to be arguing that she should never have been categorized as someone subject to the bail procedure because the offenses she committed were not crimes. (Pl.'s Opposition at 22.) This is contrary to her factual recitation identifying two of the Class E charges. It is also contrary to the "denial

---

[6] Brazier submitted a 25-page memorandum, in violation of Local Rule 7(e). That memorandum contains a six-page factual summary that cites, exclusively, Brazier's unverified complaint, despite the fact that many of the allegations she cites were denied by the defendants. Brazier's counsel should well understand by now that summary judgment factual statements must be presented in accordance with Local Rule 56 and that a pleading is not evidence. To the extent that any of Brazier's six-page "factual background" differs from or expands upon the fact statement developed by the parties under Local Rule 56, it is a waste of paper.

of bail" claim asserted in her complaint. If Brazier intends to pursue a claim that she should never have been subject to bail, it would not be a claim for deprivation of a right to bail but for deprivation of a right to be free from an unreasonable seizure, which is not among the claims contained in her complaint. Given Brazier's factual recitation that the charges were for Class E crimes, it is better to treat the claim as the claim that was actually asserted in Brazier's complaint. In any event, this claim is doomed.

The Fourteenth Amendment is the relevant constitutional provision because it restricts the power of the states, as opposed to the national government. Brazier fails to demonstrate an *arbitrary* deprivation of her Fourteenth Amendment liberty interest, because she was unable to secure the necessary funds to pay the fee associated with obtaining bail on personal recognizance. Thus, there is no denial of Brazier's Fourteenth Amendment right to due process. Additionally, to the extent that Eighth Amendment protections are applied to the states through the Fourteenth Amendment, there is no Eighth Amendment protection against overnight detention on a misdemeanor crime based on a failure to pay a bail commissioner's fee. Woods v. Michigan City, 940 F.2d 275, 282-83 (7th Cir. 1991). Finally, for the sake of argument, even if Brazier could demonstrate a deprivation of a federally-protected right, she has not laid the factual groundwork to support an imposition of liability on the County, as she has not presented any evidence that her overnight detention on a misdemeanor traffic violation arose from any county custom or policy. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978). The Court should grant summary judgment to Oxford County on count IV.

### b. *The strip search claim*

For purposes of the pending motion, the Court must take as true Brazier's assertion that she was strip searched on the occasions in question. The defendants' statement of material facts

is lacking any explanation of why jail personnel might have harbored reasonable suspicion that Brazier was secreting contraband or weapons on her person. It is established law in this federal circuit "that an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion that he is either armed or carrying contraband." Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 62 (1st Cir. 2003). "[S]trip searches are intrusive and degrading (and, therefore, should not be unreservedly available to law enforcement officers)." Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003). "When such an intrusion is extended to relatively harmless offenders, 'a severe incursion on privacy occurs.'" Wood, 354 F.3d at 62 (quoting Roberts v. Rhode Island, 239 F.3d 107, 111 (1st Cir. 2001)). Because Brazier was detained on misdemeanor charges pertaining to her driving privileges and the record lacks evidence of any reasonable suspicion that she was hiding weapons or contraband, any strip searches that did occur violated her constitutional right to be secure against unreasonable searches of her person. Building on this foundation, Brazier must generate a genuine issue of material fact whether a basis for municipal and/or supervisory liability exists.

In order to impose municipal liability on Oxford County for the alleged conduct of a corrections officer, Brazier must demonstrate that the alleged deprivations are fairly attributable to the County. One way to meet this burden is with evidence that the conduct giving rise to the alleged deprivation was executed pursuant to a county policy or pursuant to a "custom or practice that is 'so well-settled and widespread that the policymaking officials . . . can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" Wood, 354 F.3d at 64 (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)). Such a custom or practice will expose the county to liability so long as it was "the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro, 871 F.2d at 1156; see also Miller v.

12

Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000). The Supreme Court has observed that in cases like this, where there is a policy that is not unconstitutional, "*considerably more proof* than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (emphasis added) (plurality op.). Liability must not be imposed on a municipal entity "based solely upon proof that it employed a nonpolicymaking officer who violated the Constitution." Id.; see also id. at 830 & n.5 (observing that it would be equivalent to impermissible *respondeat superior* liability to permit an imposition of liability "solely because [one low-level officer's] actions on the night in question were so excessive and out of the ordinary") (Brennan, J., concurring). Another means of attributing unconstitutional acts to a municipal entity is to prove that a constitutional deprivation arose from a failure to train, as when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989). The effort to impose supervisory liability on Sheriff Herrick personally is subject to a different legal standard dependent on a showing of a personally culpable state of mind. Brazier must prove that Herrick's own "conduct or inaction amounts to 'reckless or callous indifference' of her constitutional rights and that an 'affirmative link' existed between the constitutional violation and his acts or omissions." Miller, 219 F.3d at 13 (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989)). I begin with the claims against Sheriff Herrick.

As in Miller, this record is insufficient to generate a genuine issue as to Sheriff Herrick's supervisory liability. The First Circuit affirmed the entry of summary judgment in Miller for the

13

supervisory official, despite concluding that a practice of conducting unlawful strip searches was well-established and widespread enough to support a finding of constructive knowledge on his part as a policy maker, because there was no evidence that his inaction arose from reckless or callous indifference to the plaintiffs' plight or that his personal conduct was affirmatively linked to the particular deprivations visited upon the plaintiffs.  Miller, 219 F.3d at 13.  The same conclusion is unavoidable here.  Brazier admits that all jail staff are trained at the beginning of their employment in regard to the policy and procedures applicable to searches and are given periodic updates and retraining during the tenure of their employment.  (Pl.'s Response to Defs.' Statement ¶ 13.)  She also admits that no instructions or directives are given to jail staff regarding strip searches that are in any way inconsistent with the contents of the official strip search policy.  (Id. ¶ 14.)  Finally, she admits that Sheriff Herrick did not have any knowledge of or involvement in the strip searches conducted on April 25, 2006, and May 9, 2006, and that he first learned of the strip searches in the spring of 2007.  (Id. ¶¶ 15, 16.)  These admissions mean that summary judgment should enter for Sheriff Herrick on counts II and III because there is no affirmative link between the alleged deprivations and Sheriff Herrick individually and the record is not sufficiently particularized as to Sheriff Herrick to support a finding that he harbored a callous or recklessly indifferent state of mind.

      The final questions are addressed to the potential liability of Oxford County.  The issue is whether the evidence pertaining to the three strip searches is sufficient to support a finding that routine strip searches of misdemeanor detainees was a "well-settled and widespread" practice at the Jail, such that Sheriff Herrick or Captain Martin could fairly be deemed to have had knowledge of the practice and yet did nothing to prevent it from continuing.  Because the County has in place an appropriate strip search policy and because Brazier admits that corrections

officers received related training, Brazier's presentation on this question is supposed to involve "considerably more proof than [a] single incident" to ensure that liability is not "based solely upon proof that [Oxford County] employed a nonpolicymaking officer who violated the Constitution." Tuttle, 471 U.S. at 824, 830.

      Brazier argues that Captain Martin's 2002 memorandum reminding corrections officers about the strip search policy and earlier memoranda circulated in 1989 and 1992[7] prove, in conjunction with the strip searches in question, that a practice of conducting inappropriate strip searches was ongoing despite the official policy. (Pl.'s Opposition at 17-19.) In assessing the case for county liability, the Court must consider the potential finding that Brazier was subjected to unconstitutional strip searches on two different occasions roughly two weeks apart. Based on Brazier's motion to substitute and the papers filed in connection with it (particularly Brazier's answers to interrogatories), it would appear to be the case that the same corrections officer, Arlene Kerr, conducted all of the three strip searches in question and that she made damaging admissions respecting her understanding of customary jail procedure. There is no evidence flagged by Brazier of other detainees being subjected to similar treatment or of other officers conducting strip searches under similar circumstances in the 2006 timeframe. Nor is there any evidence that the alleged strip searches proceeded from a decision made by a policymaking official within the Oxford County Jail, such as Captain Martin or Sheriff Herrick. This is, in effect, the sum and substance of the record with respect to the county liability question: three

---

[7]     These earlier memoranda did not make it into either of the statements of material facts.

violations by a solitary corrections officer within a span of two weeks and an alleged admission by that same officer that her treatment of Brazier conformed to jail practice.[8]

In Miller, the First Circuit held that a case for municipal liability was demonstrated where the plaintiff "offered undisputed evidence that . . . all persons unable to make bail were routinely strip searched regardless of whether they were suspected to have weapons or contraband, and that she herself was strip searched repeatedly during her forty-eight hour detention." Id. at 12-13. The evidence that supported this finding included the testimony of a low-level corrections officer that "contrary to the County's written policy which conformed to constitutional standards, all arrestees unable to make bail are strip searched." Id. at 12. It also included the evidence that the plaintiff was subjected to repeated strip searches during a 48-hour stay at the jail. It is unclear from the First Circuit opinion and from the District Court's opinion, 63 F. Supp. 2d 75, 79 (D. Me. 1999), whether the same officer conducted each of the strip searches. Potentially, different officers could have performed the strip searches in Miller, which would be additional evidence of a *widespread* custom or practice shared by jail personnel. In any event, even if the same female officer performed all of the strip searches in Miller, it was a different male officer who offered the testimony as to the jail's customary practice at trial, so that the record reflected not only multiple incidents, but also multiple officers corroborating the existence of an unconstitutional customary practice—one by her unconstitutional conduct, the other by his admission as to customary practice. I make these observations only because there are theoretical grounds upon which to distinguish Miller from the case at hand. Here, it is known that the same officer conducted all three strip searches and it is that very same officer who purportedly told

---

[8] I do not regard the 2002 memorandum as having any appreciable probative value concerning the custom or practice in place in 2006 given that there is a temporal gap of four years. Moreover, the 2002 memorandum does not contain any reference to the possibility that its issuance was prompted by any ongoing custom or practice of performing strip searches on all misdemeanor detainees.

16

Brazier of the existence of a customary practice to routinely strip search all inmates moving into or out of the facility. This kind of fact pattern could reflect a solitary mixed-up corrections officer or a well-settled and widespread custom at the jail.

Other courts have concluded that a well-settled, widespread custom cannot be established on the basis of two or three incidents involving a solitary officer. See, e.g., Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (holding that two prior incidents involving defendant officer, coupled with vague "rumors that do not implicate a particular officer" did not demonstrate a "persistent and widespread" pattern reflecting a custom of overlooking police misconduct). The First Circuit has observed in another opinion that the number of officers involved is highly significant when an inference of a municipal custom is being made. In Kibbe v. Springfield, it held that three shooting incidents in one night involving three officers discharging their weapons could support an inference of a widespread custom or policy associated with the challenged conduct because of the number of officers involved. 777 F.2d 801, 805 (1st Cir. 1985). The fact pattern of Kibbe, however, reflects conduct by officers responding to unfolding events in the field, which is distinct from the far more predictable matter of deciding whether to strip search a particular detainee in connection with routine jail processing. Consequently, when a particular officer engages in misconduct in the field, on his or her own, the inference that there is an underlying custom giving rise to the conduct is not logically drawn based exclusively on the incident itself, unless and until it is shown that the conduct is participated in by multiple officers or by the same officer on multiple occasions that have come to the attention of policymakers who have not addressed the misconduct through training or discipline. On the other hand, when a particular officer repeatedly engages in unlawful conduct during a routine procedure like processing a misdemeanor arrestee who fails to make bail or a misdemeanor detainee returning

17

from court in shackles who is entitled to immediate release by court order, it is relatively difficult to understand how it would happen, or why any rational corrections officer would wish to perform such a search, in the absence of a customary practice that has somehow endured despite the existence of a contrary written policy.

I am concerned that this case may not meet the "considerably more" admonition of the Tuttle plurality, which suggests that summary judgment might be appropriate. On the other hand, I am also concerned about the precedential force of the First Circuit's opinion in Miller, which bears a certain resemblance to the facts of this case, though I have suggested some potential distinctions. Ultimately, my recommendation is to deny summary judgment to Oxford County on count I due, essentially, to the fact that the processing that resulted in the alleged strip searches presumably followed a routine jail procedure, because Arlene Kerr's alleged conduct was similar under two separate and distinct scenarios, neither of which should have resulted in a strip search, and because of the potential finding that Arlene Kerr admitted to Brazier that her conduct conformed to the Jail's practice. This evidence appears minimally sufficient to support a finding that Brazier was subjected to unconstitutional strip searches arising from an established custom that could not or should not have gone unnoticed and would not have existed without the acquiescence of policymaking officials and, by extension, without an awareness of an obvious need for additional or different training.

## Conclusion

For reasons set forth above, I RECOMMEND that the Court GRANT, IN PART, the defendants' motion for summary judgment (docket item 9), by entering judgment against the plaintiff on counts II (claim of supervisory liability asserted against Sheriff Herrick in relation to

the strip searches), III (punitive damages against Herrick for the same), and IV (claim of municipal liability asserted against Oxford County premised on the denial of bail theory).

I also RECOMMEND that the Court DENY the defendants motion for judgment on the pleadings (docket item 10).

I further RECOMMEND that the Court deny the plaintiff's motion to substitute Arlene Kerr for Jane Doe (docket item 18) and dismiss counts V and VI because service has never been made on the Jane Doe defendant.  Alternatively, as a sanction for the plaintiff's failure to comply with the Court's scheduling order and for her dishonest explanation for her noncompliance, if defense counsel accepts service on behalf of Arlene Kerr, I recommend that she be substituted as a named party defendant and judgment be entered on her behalf.

If accepted, this recommendation will leave only count I for trial (a claim of municipal liability asserted against Oxford County in relation to the alleged strip search custom).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 13, 2008